**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | CASE NO. 12 C 9769 |
| v. | ) | (related Criminal CASE NO. 10 CR 15) |
| | ) | |
| SARITA LANDRUM, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| Petitioner. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Petitioner Sarita Landrum's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 [1] and the United States' response in opposition [12]. For the reasons stated below, the Court denies Petitioner Landrum's motion [1].

**I.      Background**

On April 15, 2010, the Special January 2009 Grand Jury indicted Sarita Landrum with four counts of mail fraud affecting a financial institution, in violation of 18 U.S.C. § 1341. On April 29, 2010, Landrum appeared for her arraignment and pleaded not guilty to all counts. On May 18, 2011, Landrum withdrew her plea of not guilty to Count Four of the indictment and pled guilty to Count Four of the indictment pursuant to a written plea agreement. Landrum's written plea agreement included the following factual basis, in relevant part:

> Beginning no later than in or about July 2009, and continuing until at least on or about September 11, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant SARITA LANDRUM (hereinafter "LANDRUM"), Dwayne L. Hogans (hereinafter "Hogans"), together with their co-schemers, devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme affected a financial institution, and for the purpose of executing the scheme and attempting to do so caused certain matter to be delivered by the United States Postal Service, in violation of Title 18, United States Code, Section 1341.

From in or around December 2007 through in or around September 11, 2009, LANDRUM was employed as a customer service representative at a Fifth Third Bank branch located at 1606 E. 79th Street, Chicago, Illinois. . . . As an employee of Fifth Third Bank, LANDRUM had access to personal and account information regarding account holders at Fifth Third Bank, but was authorized to use this information solely in the performance of her official duties.

In the summer of 2009, Hogans recruited LANDRUM to assist Hogans in a scheme to fraudulently obtain money from Fifth Third Bank.  More specifically, Hogans recruited LANDRUM to provide Hogans with sensitive personal and account information of account holders at Fifth Third Bank that, as LANDRUM well knew, Hogans would use fraudulently to withdraw money from the victims' accounts.   Moreover, Hogans instructed LANDRUM to seek out and provide Hogans with information about accounts with high balances. Hogans offered to pay LANDRUM several thousand dollars in cash in exchange for this information. LANDRUM knew that she was not authorized to provide Hogans with this information, and knew that HOGANS intended to use the information to withdraw funds fraudulently from victims' accounts at Fifth Third Bank without the victims' knowledge or authorization.    With this knowledge, LANDRUM agreed to participate in the scheme.

Beginning no later than July 2009 and continuing through at least August 2009, LANDRUM provided Hogans with sensitive personal and account information of at least 34 different account holders at Fifth Third Bank. This information included the account holders' names, home addresses, home telephone numbers, dates of birth, social security numbers, drivers' license numbers, key words or mothers' maiden names, checking account numbers, savings account numbers, debit card numbers, and the balance in each account held at Fifth Third Bank. In the majority of cases, LANDRUM relayed this information by printing out internal Fifth Third Bank documents referred to as customer "profiles" and giving those documents to Hogans.

On at least one occasion, LANDRUM accessed an account at Fifth Third Bank, changed the mailing address of that account to an address controlled by Hogans, and ordered that a new debit card be mailed to the address controlled by Hogans, all without the account holder's knowledge or authorization.

. . . .

The accounts compromised by LANDRUM during the course of the scheme suffered a total of $479,351.04 in fraudulent transactions, causing a total actual loss of $450,751.06. . . .

See Doc. 64 at 2-4 in Case. No. 10-cr-15. In her plea agreement, Landrum further admitted that: (1) she had read the charges against her contained in the indictment, and that those charges had been fully explained to her; (2) she fully understood the nature and elements of the crimes with which she was charged; and (3) she would plead guilty because she was in fact guilty of the charge contained in Count Four of the indictment. The plea agreement further explained that the maximum possible term of imprisonment was 30 years and that Landrum could not be sentenced to a term of imprisonment for the offense. Landrum further acknowledged in her plea agreement that the total amount of restitution owed to the victims was $450,751.06.

The plea agreement also set forth numerous rights that Landrum would be waiving by pleading guilty, including her right to a public and speedy trial by jury, the possibility of a bench trial if all parties agreed, the right to strike potential jurors for cause or without cause at any jury trial, the fact that jurors would be instructed at any trial that she was presumed innocent and that the Government bore the burden of proving her guilty beyond a reasonable doubt, the requirement that the jury agree unanimously in order to convict her, the right of defendant to confront and cross-examine any witnesses called by the Government, a defendant's right to call witnesses in her defense and to require the attendance of witnesses through the subpoena power of the Court, and her right to refuse to testify at trial or to choose to testify in her own defense. The plea agreement explicitly provided, "Defendant further understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction." In her plea agreement, Landrum acknowledged, "Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights."

Landrum further acknowledged that "no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty." Finally, in the paragraph immediately above her signature, Landrum "acknowledge[d] that she had read this Plea Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement."

At the change-of-plea hearing, the Court placed Landrum under oath. While under oath, she confirmed that she had enough time to talk to defense counsel George Pappas about the case, that she had told counsel everything she knew about the case, and that she was satisfied with Mr. Pappas's efforts on her behalf. She further confirmed that she understood the charges against her. The Court then explained in detail the numerous rights that she would be giving up if she pleaded guilty, including, among other things, the right to a trial by jury, to plead not guilty, the fact that she would be presumed innocent at any trial and could not be convicted unless the Government presented evidence proving her guilty beyond a reasonable doubt. Landrum confirmed that she understood each of these rights. The Court further explained that Landrum would have the right to appeal her sentence within 14 days if she believed that it was incorrect, and Landrum again confirmed that she understood this. The Court then reviewed the written plea agreement with Landrum, who confirmed that no other agreements or promises had been made to her that were not in writing, that her signature appeared on the last page of the plea agreement, that she read the plea agreement before she signed it, and that she reviewed it with defense counsel before signing it.

In Landrum's presence, the Government then orally reiterated that the maximum term of imprisonment for Count Four was 30 years, that probation was not an option under the law, and

that the parties had agreed to restitution in the amount of $450,751.06. The Court, the Government, and defense counsel then explained the parties' differing preliminary calculations under the Sentencing Guidelines. After these positions had been explained, the Court explained to Landrum that the Court could not determine which calculation of the guidelines was correct until after the Presentence Investigation Report ("PSR") had been prepared, and that, in any event, the Court had the authority to impose a sentence that was higher than the guideline range, that if the sentence turned out to be more severe than what Landrum was hoping for, she would have no right to withdraw her plea, and that the final decision as to Landrum's ultimate sentence would rest with the Court. Landrum confirmed that she understood these points and also confirmed that her decision to plead guilty was voluntary. The Government then summarized the factual basis in language that largely tracked the language of the written plea agreement. The Court then asked Landrum whether the Government's evidence was correct, and Landrum confirmed that it was correct, that there was nothing she disagreed with, and there was nothing that she wanted to add to the Government's statement at that time. Landrum then stated that her plea to Count Four of the indictment was guilty. The Court accepted her plea and entered a finding of guilty as to Count Four of the indictment.

Prior to the preparation of the PSR, the Government submitted its version of the offense to the probation officer and to defense counsel. The Government's version explained, "It is clear that LANDRUM did not personally initiate any of the fraudulent transactions on the compromised accounts." Nevertheless, the Government's version maintained that Landrum was responsible for the loss amount on all of the accounts that she compromised because she was a substantial and contributing cause of that loss. See also U.S.S.G. § 1B1.13(a)(3). The Government's version explained that co-defendant Dwayne Hogans also recruited Tiffany

Nelson, another teller who worked at a different Fifth Third Branch, to help him in the scheme. The Government set forth a chart summarizing Fifth Third Bank's employee access logs, which logs showed that, for all 34 accounts that were compromised as a part of the scheme, Landrum personally accessed each of those accounts, and that of those 34 accounts, Fifth Third Bank's logs also showed that Nelson accessed the accounts. For all but one of those accounts, no actual loss occurred. Victim MJD was the one victim whose account sustained an actual loss, and whose account was accessed by both Landrum and Nelson. The fraudulent transactions on Victim MJD's account occurred between October 14, 2009, and November 3, 2009, after Landrum had accessed the victim's account, but before Nelson had done so. Accordingly, the evidence demonstrated that Landrum was a contributing cause to the losses on Victim MJD's account and that Nelson was not.

On July 22, 2011, the probation officer submitted an updated PSR. The PSR specifically noted the existence of Tiffany Nelson's related case in the Northern District of Indiana. Moreover, the PSR noted that "Landrum did not personally initiate any of the fraudulent transaction[s] on the compromised accounts." PSR at 6. The PSR found that the total amount of restitution owed by Landrum was $450,751.06, minus any credits for funds repaid prior to sentencing.

On December 19, 2011, the Court held a sentencing hearing. At the outset, defense counsel confirmed that he had reviewed the PSR with Landrum and that they were agreeing with the PSR's guideline calculations. The Court then addressed Landrum, who confirmed under oath that she had reviewed the PSR, had gone over it with defense counsel, and did not have anything that she wanted to add or subtract to what her counsel had said about the PSR. Later in the hearing, Landrum again confirmed that she had reviewed the PSR several times with defense

counsel.  At another point in the hearing, Landrum confirmed that "she knew from day one * * * of the possibility after pleading guilty that [she] might be going to jail."

In beginning its preliminary examination of the sentencing factors under 18 U.S.C. § 3553(a), the Court explicitly took note of the fact that Landrum had not in fact received any money as a part of the scheme and that Hogans, not Landrum, was the person who dictated the exact amount of money to withdraw.  Likewise, defense counsel argued that the guidelines, including the amount of the loss, overstated the seriousness of the offense as to Landrum and that the fact that she did not receive any money as a part of the crime was another factor the Court should consider in weighing the § 3553(a) factors.  The Court expressed its agreement that the guideline loss amount overstated Landrum's actual culpability for the loss amount and was a factor that it would consider in fashioning the ultimate sentence.

Landrum spoke at length—partly in narrative, partly in response to questions posed by defense counsel, partly in response to questions posed by the Government, and partly in response to questions posed by the Court.  During her allocution, Landrum admitted that she had been approached by Hogans, that he offered to pay her approximately $10,000 in exchange for sensitive account information for customers of Fifth Third Bank, that she agreed to do so even though she knew that giving Hogans the account information was illegal, and that she provided Hogans with the account information for 34 different customers' accounts.  On some points, Landrum's testimony was internally inconsistent. She first testified that at the beginning of the scheme, she did not know what Hogans planned to do with the account information, but that she later learned of his plans, and even after learning of his plans, continued giving him account information.  However, at a later point, she insisted that while she was providing Hogans with the account information, she did not know that he intended to withdraw money from the

accounts, and as soon as she suspected that Hogans was intending to withdraw money from customers' accounts, she cut all ties with him and gave him no further customer information. At the end of her lengthy testimony, Landrum stated that she was sorry for her mistake, that it was irresponsible, and that she had let down her family, her employer, her church, and her community. The Court then entered and continued the sentencing hearing to January 18, 2012, because it wanted some additional time to think through the contested guideline issues as well as the § 3553(a) factors.

On January 18, 2012, the Court held a continued sentencing hearing. The Court agreed with the Government's proposed guideline calculations, including an intended loss amount in excess of $1,000,000, an upward adjustment for obstruction of justice, and a denial of a downward adjustment for acceptance of responsibility. In weighing the § 3553(a) factors, the Court found that the amount of the guideline loss overstated the seriousness of the crime as to Landrum and stated that it was taking that into consideration in fashioning the ultimate sentence. The Court also found that Landrum clearly knew that Hogans was intending to withdraw money from the victims' account well before she stopped participating in the scheme and that Landrum had not testified entirely truthfully during the December 19, 2011, sentencing hearing. After weighing all of the § 3553(a) factors, the Court imposed a sentence of 60 months. After imposing the sentence, the Court again advised Landrum that if she wanted to appeal the sentence, she would have to do so within 14 days of the date of the entry on the record of the judgment of conviction. Landrum confirmed that she understood this, but did not appeal this Court's sentence.

On November 19, 2012, Petitioner signed her *pro se* Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("petition"). Petitioner's

petition was received and filed by the Clerk on December 7, 2012. The Government filed a response to the petition.

## II.    Analysis

In her motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255, Landrum raises several alleged errors and shortcomings of her defense counsel that, according to her, amount to ineffective assistance. Relief under § 2255 is an uncommon remedy because it requires the district court "to reopen the criminal process to a person who already has had an opportunity for full process." *McMahan v. United States of America,* 2009 WL 509869, at *1 (N.D. Ill. Mar. 2, 2009). A § 2255 motion to vacate to set aside or correct a sentence will be granted only if the petitioner establishes "that the district court sentenced [her] in violation of the Constitution or laws of the United States or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." *Hays v. United States*, 397 F.3d 564, 566-67 (7th Cir. 2005)). If a § 2255 petitioner does not raise a claim in her direct appeal, that claim is barred from the Court's collateral review unless the petitioner can demonstrate cause for the procedural default and actual prejudice from the failure to appeal (see *Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005)), that enforcing the procedural default would lead to a 'fundamental miscarriage of justice" (*Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006), or that there has been a change of circumstances involving facts or law (*Varela v. United States*, 481 F.3d 932, 935 (7th Cir. 2007)). Because claims of ineffective assistance of counsel usually involve evidence outside the trial record, such claims may be brought for the first time in a § 2255 motion.[1]  See *Massaro v. United States*, 538 U.S. 500, 504 (2003).

---

[1]  A claim of ineffective assistance of counsel which is based upon the trial record alone must be brought on direct appeal. *Olmstead v. U.S.*, 55 F.3d 316, 320 (7th Cir. 1995).

To succeed on an ineffective assistance claim, Petitioner must prove both that (1) her counsel's performance fell below "an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Regarding the first prong, the "review of the attorney's performance is 'highly deferential' and 'reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007) (quoting *Strickland*, 466 U.S. at 689). "For the second element, defendant must show that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* at 434 (quoting *Strickland*, 466 U.S. at 687). The standards created by *Strickland* and § 2254 are both highly deferential * * * and when the two apply in tandem, review is doubly so." *Richter*, 131 S. Ct. at 788 (internal quotation marks omitted); see also *Pinholster*, 131 S. Ct. at 1408 ("reiterat[ing] that surmounting Strickland's high bar is never an easy task" and that the "Strickland standard must be applied with scrupulous care") (internal quotation marks omitted).

To show that the counsel's performance was unreasonably deficient, the defendant must identify specific acts or omissions that fall outside the wide range of competent assistance. *Lilly v. Gilmore*, 988 F.2d 783, 785 (7th Cir. 1993). A single alleged error or oversight is rarely so egregious as to violate the Sixth Amendment. *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009). "[J]udges must not examine a lawyer's error (of omission or commission) in isolation." *Id.* "It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Id.* The [Supreme] Court has allowed for the possibility that a single error may suffice 'if that error

is sufficiently egregious and prejudicial.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "Lest this exception swallow the rule, however, we must take the Justices at their word and search for an 'egregious' error–an omission of something obviously better (in light of what was known at the time) than the line of defense that counsel pursued." *Id.* Finally, a court must not judge a lawyer's conduct using the benefit of hindsight. *Strickland*, 466 U.S. at 689.

Landrum's petition alludes to an array of alleged errors that she claims entitle her to habeas relief. Even under the liberal standards afforded to *pro se* petitioners, a movant is not entitled to an evidentiary hearing when her "allegations are 'vague, conclusory, or palpably incredible rather than detailed and specific.'" *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006). "[I]n order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." *Id.* (quoting *Barry v. United States*, 528 F.2d 1094, 1101 (7th Cir. 1976)). Instead of following this guidance, Landrum presents a list of grievances, without citation to any case and with very little factual elaboration. She also refers in passing to being denied her "first amendment right to freedom of speech," her "right to the press," her right "to petition the Government for a redress of grievances," and her "14th Amendment right for equal protection." These constitutional provisions have no obvious application to the case at hand, and Landrum has failed to link those rights to violations in this case. To the extent that Landrum makes specific, discernible claims, the Court addresses each of those claims below.

### A.     Safety Value Issues

Landrum's petition raises two related arguments pertaining to what is colloquially referred to as the "safety valve." Landrum asserts that her counsel was ineffective for not seeking the safety value and for failing to advise her of "the risk[s] and benefits of the Safety

valve." Whether the argument is framed as a deficiency in not seeking this relief or as not adequately advising Landrum, the argument fails because the "safety valve" has no application to this case. By its plain terms, the provision applies only to offenses under specified provisions of the Controlled Substances Act codified in Title 21. See 18 U.S.C. § 3553(f). Because Landrum was indicted for mail fraud affecting a financial institution under 18 U.S.C. § 1341, the "safety valve" provision had no application to her case. Accordingly, her counsel could not have been ineffective for failing to explain that provision or seeking it in this case.

### B. Appellate Rights

Landrum raises multiple claims pertaining to counsel's performance regarding an appeal. First, she asserts that defense counsel did not advise her of the time limit for filing an appeal. Even assuming solely for the purposes of argument that this is true, Landrum could not have been prejudiced by the lack of advice by counsel because she was advised (i) in her written plea agreement, (ii) at her change-of-plea hearing, and (iii) at the end of the January 18, 2012 sentencing hearing that she needed to file any appeal within 14 days of the entry of the judgment on the Court's docket. Because Landrum was advised several times regarding the time limit for filing her notice of appeal, she could not have been prejudiced by the alleged lack of advice from counsel regarding that deadline.

Landrum also asserts that "at sentencing I asked Attorney Pappas Could I file an appeal and he told me that it would not be a wise decision. That was the last time I heard from him." This assertion does not establish ineffective assistance on behalf of defense counsel. "If counsel has consulted with the defendant [about an appeal], the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Roe v. Flores-Ortega*, 528

U.S. 470, 478 (2000). Because Landrum's petition makes clear that defense counsel *did* consult with her about the possibility of filing an appeal, and because she has not alleged that she expressly instructed counsel to file an appeal on her behalf, Landrum has failed to establish ineffective assistance with respect to her appeal rights.

### C.    Availability of Probation

Landrum also asserts that her counsel was defective because he promised her that she would be sentenced to a term of probation.  However, her written plea agreement explicitly provided that the maximum possible sentence for the crime she was pleading guilty to was 30 years of imprisonment and further provided that probation was not an option under the law. Second, at her change-of-plea hearing, she confirmed that she had read her plea agreement, reviewed it with her attorney, and signed it after reading it.  Third, at the change-of-plea hearing, the Government again reiterated that the maximum term of imprisonment was 30 years and that Defendant could not be sentenced to a term of probation.  Fourth, this Court explained to Landrum at the change-of-plea hearing that it could impose a sentence above the advisory guideline range and that the ultimate decision regarding what sentence would be imposed rested with the Court.  Landrum confirmed that she understood this and that no one had made her any promises to cause her to plead guilty other than the promises in her written plea agreement. Fifth, at the sentencing hearing on December 19, 2011, Landrum again testified, under oath, that "she knew from day one * * * of the possibility after pleading guilty that [she] might be going to jail."

Even if one ignores Landrum's testimony under oath and assumes that she was advised prior to her guilty plea that she would receive probation, she repeatedly was disabused of that alleged belief through her written plea agreement and by the Government and the Court on the

record during the change-of-plea hearing. With that knowledge, she chose to plead guilty anyway, meaning that any defective advice cannot have caused her to plead guilty and forego a trial. See *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (holding that in the context of a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."); see also *United States v. Stewart*, 198 F.3d 984 (7th Cir. 1999) (rejecting an argument raised on direct appeal virtually identical to the one raised here: "The fundamental problem with this position is that [the defendant] has already had one opportunity to state, under oath and in the presence of the district judge, whether his attorney gave such defective advice. That opportunity was the plea hearing, and [the defendant] swore that no such advice had been given."). "Entry of a plea is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath. Thus when the judge credits the defendant's statements in open court, the game is over." *Id*. at 987 (noting that "[t]here will be no further evidentiary hearing, and an appeal is pointless (indeed, frivolous)"); see also *United States v. Peterson*, 414 F.3d 825, 826-27 (7th Cir. 2005). Accordingly, Landrum's argument that her counsel was defective because she allegedly was promised a particular sentence fails.

### D. Defense Counsel's Investigation and Review of the PSR

Landrum also raises a series of claims that defense counsel was inadequate because he allegedly did not spend sufficient time investigating the case or preparing for the sentencing with Landrum. More specifically, Landrum asserts, "During the time in which I was represented by George Pappas he had a heart attack, and I had no contact with him for months. I did not know

what was going on with my case, because it was months since I had heard from him." Landrum also claims, "Without investigation of any of the facts, Attorney Pappa's [sic] willingness to accept the government's version of the facts of the case he advise me to withdraw my plea from not guilty to guilty." Similarly, Landrum complains that defense counsel did not review the PSR with her.

As with many of Landrum's assertions, these arguments are foreclosed by the record. Before entering her guilty plea, Landrum confirmed under oath at her change-of-plea hearing that she had had enough time to talk with her counsel, that she had told her counsel everything she knew about the case, and that she was satisfied with defense counsel's advice and efforts. Accordingly, whatever communication problems may have been caused by counsel's health issues, those problems had been resolved to Landrum's satisfaction by the time she chose to plead guilty. See *Stewart*, 198 F.3d at 987. Similarly, Landrum already testified under oath that she did review the PSR with her counsel on several occasions prior to sentencing. "[A] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." *United States v. Peterson*, 414 F.3d 825, 826-27 (7th Cir. 2005). Landrum gives no explanation for why the Court should ignore her prior sworn testimony that she did review the PSR with defense counsel. Her arguments pertaining to the PSR fail.

### E.     Plea

Landrum also asserts that she is entitled to habeas relief because her guilty plea was not knowing and voluntary. The Supreme Court has "strictly limited the circumstances under which a guilty plea may be attacked on collateral review." *Bousley v. United States*, 523 U.S. 614, 621 (1998). "'It is well settled that a voluntary and intelligent plea of guilty made by an accused

person, who has been advised by competent counsel, may not be collaterally attacked." *Id.* (quoting *Mabry v. Johnson*, 467 U.S. 504, 508 (1984)). "And even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review." *Id.* Landrum failed to challenge the voluntariness or intelligence of her guilty plea on direct review because she took no appeal at all.

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Id.* (internal citations omitted). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the * * * procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Construing Landrum's pleadings liberally, the only possible argument for why she failed to challenge the voluntariness of her guilty plea on direct appeal would be her claim that counsel somehow was defective either by failing to advise her of the time limit for filing on appeal, or for not filing an appeal. But as explained above, Landrum was well aware of the time limit for filing an appeal regardless of what her counsel did or did not tell her, and because she has not alleged that she expressly instructed counsel to file an appeal, his actions on this point do not amount to ineffective assistance. Accordingly, Landrum has not established "cause" that can excuse her procedural default in failing to challenge her guilty plea on direct appeal.

Even if Landrum could overcome her procedural default, her challenge to her guilty plea would fail in the face of an abundance of evidence that her plea was made voluntarily and knowingly. She asserts that her guilty plea was not voluntary because she did not understand "the nature of the charge and the consequences of the plea." Elsewhere in her petition, she asserts

that the plea was not knowing and voluntary because counsel "failed to advise me of the risks and benefits of a plea offer."   Contrary to these assertions, as detailed above, Landrum was advised in detail both through her written plea agreement and by the Court regarding the rights she was waiving by pleading guilty, and because she confirmed in writing and in open court that it was entirely her decision to plead guilty, her plea was both knowing and voluntary.  The record conclusively shows that Landrum was adequately informed through her plea agreement and by the Court regarding the rights she was waiving by pleading guilty; thus, any alleged failure by her counsel cannot have prejudiced her on this score.

### F.      Intent to Defraud

Landrum raises a series of similar arguments that all appear to focus on the issue of whether she had the requisite intent to defraud.  For example, she asserts that although she did give co-defendant Hogans account information for customers at Fifth Third Bank, "I was naive, and was led to believe that Hogans wanted the account information to wire money in and out of the accounts for mortgage purposes."   Along the same lines, she claims, "I had no idea or involvement in any fraudulent withdrawals I was unaware that Hogan was draining money out of the bank accounts that were provided."   These arguments fail because they are entirely inconsistent with Landrum's written plea agreement and her sworn testimony at her change-of-plea hearing, and already have been considered–and rejected–by this Court.

### G.      Restitution

Landrum also makes a series of claims centering upon the issue of restitution. For example, she claims that she was "coerced to sign for a restitution amount which I never received nor did I know anything about."   Similarly, she criticizes her attorney, saying that he "did not argue the restitution amount of $450,751.06."   According to Landrum, her counsel

should have contested this figure because "this amount contradicts the statement in my PSR lines 499-501; 'under Part E. Factors that may warrant a departure it states that the greatest enhancement in guideline calculations is due to loss amount. Though Landrum unlawfully provided account and personal information to Hogans, there is no evidence to suggest she participated in the fraudulent withdrawals, which account for the loss amount.'" She elsewhere points out that she did not receive any of the money fraudulently withdrawn from the victim's accounts, and further complains that she "was also unaware that he [Hogans] had another Customer service rep working at another banking institution as well."

First, to the extent that Landrum argues that she was coerced into signing her plea agreement, in which she agreed that the restitution amount she owed was $450,751.06, this argument, like many others advanced by Landrum, is foreclosed by the record. She confirmed in her written plea agreement that no threats or promises had been made to her aside from the promises set forth in the plea agreement. And she confirmed under oath that she had reviewed the plea agreement, signed it, that no one had threatened her in any way to cause her to plead guilty, and that her decision to plead guilty was entirely voluntary.

Second, Landrum claims that her counsel was ineffective at sentencing because he did not challenge the restitution figure. She appears to be asserting that her counsel should have disputed the restitution amount because it was inconsistent with the PSR. However, as explained above, Landrum agreed to the restitution figure in her written plea agreement. Counsel therefore had no basis to challenge the restitution amount and doing so would have amounted to a breach of the plea agreement and further undermined Landrum's argument for acceptance of responsibility. Moreover, her assertion that the PSR provided some basis to challenge the

restitution figure is simply incorrect. The PSR agreed with the calculation set forth in the plea agreement and the Government's version.

Next, Landrum points out that she did not receive any money from the scheme. However, receipt of scheme proceeds is not an element of the crime of mail fraud. See *United States v. Spano*, 421 F.3d 599, 602 (7th Cir. 2005) ("A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants"). She points to the fact that Tiffany Nelson also participated in the scheme. But the Government is not obligated to prove that Landrum acted alone or that she was the only teller who participated in the fraudulent scheme. Rather, the Government's burden is to prove that Landrum was one of the knowing participants in the scheme. Accordingly, the fact that she did not receive any money for her participation in the crime, or the fact that Tiffany Nelson also participated, does not undermine Landrum's guilt in any way.

Furthermore, the fact that Landrum was not paid for her participation in the crime likewise is irrelevant to the restitution calculation. The loss-amount statutes make clear that calculation of the amount of restitution focuses on the loss to the victim, not the gain to a particular defendant, and that where more than one defendant contributed to the loss to a victim, the Court has discretion to order that each defendant pay the full amount of the restitution owed to that victim. Because Landrum admitted in her plea agreement, at her change-of-plea hearing, and at sentencing that she provided co-defendant Hogans with account information for the 34 victims at Fifth Third Bank, her actions are a but-for and substantially and contributing cause of the losses sustained by each of the victims.

Finally, Landrum appears to argue that her counsel was ineffective at sentencing for not pointing to the fact that she did not receive a financial benefit as a fact in mitigation to be

considered under 18 U.S.C. § 3553(a). But defense counsel did raise this argument, and the Court took the point into consideration as a mitigating factor under § 3553(a) in fashioning the ultimate sentence. All of Plaintiff's various arguments related to the restitution amount fail.

## III. Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner Landrum a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition; instead, he must first request a certificate of appealability. See *Miller–El v. Cockrell,* 537 U.S. 322, 335 (2003); *Sandoval v. United States,* 574 F.3d 847, 852 (7th Cir. 2009). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *Miller–El,* 537 U.S. at 336; *Evans v. Circuit Court of Cook County, Ill.,* 569 F.3d 665, 667 (7th Cir. 2009). Under this standard, Petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). And in cases where a district court denies a habeas claim on procedural grounds, the habeas court should issue a certificate of appealability only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. See *Slack,* 529 U.S. at 485.

Consistent with the detailed discussion above, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right, nor would reasonable jurists differ on the Court's assessment of Petitioner's claims. Thus, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

**IV.   Conclusion**

For the reasons set forth above, the Court denies Sarita Landrum's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 [1], declines to certify any issue for appeal, and directs the Clerk to enter judgment in favor of the United States.

Dated: May 13, 2013                  _____
                                                    Robert M. Dow, Jr.
                                                    United States District Judge